## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## MARTINSBURG

**DAVID M. TERRELL, Jr.**

      **Plaintiff,**

**v.**                                        **Civil Action No.: 3:10-CV-88**
                                                     **JUDGE BAILEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [11], AND AFFIRM THE RULING OF THE COMMISSIONER

## I.  INTRODUCTION

On September 20, 2010, Plaintiff David M. Terrell ("Plaintiff"), by counsel Craig R. Lavender, Esq., filed a complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1)  On November 23, 2010, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 5; Administrative Record, ECF No. 6)  On December 23, 2010, and February 22, 2011, the Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.

(Pl.'s Mot. for J. on the Pleadings, ECF No. 8; Def.'s Mot. for Summ. J., ECF No. 11)  On March 29, 2011, the Plaintiff's counsel filed a motion to substitute party, requesting the Court to substitute the Plaintiff's son, David M. Terrell Jr., as the party plaintiff due to the death of Mr. Terrell on December 30, 2010.  (Pl.'s Mot. for Substitution, ECF No. 13)  The Court granted this motion on May 16, 2011.  (Order Granting Pl.'s Mot. for Substitution, ECF No. 14)  Following review of the motions by the parties and administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. BACKGROUND

A.    Procedural History

On September 8, 2009, the Plaintiff protectively filed the present claim[1] for disability insurance benefits ("DIB"), alleging disability beginning January 12, 2001.  (R. at 117-125)  His claim was initially denied on October 15, 2009, and denied again upon reconsideration on December 10, 2009.  (R. at 49-50)  On January 15, 2010, the Plaintiff filed a written request for a hearing, which was held by video before a United States Administrative Law Judge ("ALJ") on February 17, 2010.  (R. at 31-47, 72-73)  The Plaintiff did not appear due to illness, but was represented by Jan Dils, esquire, who was present in Parkersburg, West Virginia.  (R. at 14)  The ALJ presided over the video hearing from Charleston, West Virginia, and Cecilia Thomas, an impartial vocational expert, also appeared at the hearing.  (R. at 14)  On March 10, 2010, the ALJ issued an unfavorable

---

[1] The Plaintiff previously filed two other applications for disability insurance benefits. His first claim was filed on June 15, 2002, and was denied on September 3, 2002.  (R. at 51-55) His second claim was filed on October 20, 2005, and was denied on February 9, 2006.  (R. at 56-60)  All three of his disability claims alleged an onset date of January 12, 2001.

decision to the Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. at 14-26) On July 21, 2010, the Appeals Council denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3) The Plaintiff now requests judicial review of the ALJ decision denying his application for disability.

B.     <u>Personal History</u>

David M. Terrell was born July 8, 1948, and was 61 years old at the time he applied for disability insurance benefits. (R. at 117) He received his GED in 1969, and had prior work experience in retail sales and computers. (R. at 181, 186) Mr. Terrell deceased on December 30, 2010, leaving behind a son, David M. Terrell, Jr., who has been substituted as the party plaintiff in this action. (Pl.'s Mot. for Substitution, ECF No. 13)

C.     <u>Medical History</u>[2]

The Plaintiff's medical records show that he was treated by the Veterans Administration Medical Center ("VAMC") at Clarksburg, West Virginia, for various mental and physical illnesses from July 19, 2000 through January 29, 2010. (<u>See</u> R. at 230-521, 550-645, 670-848, 853-908)

On April 4, 2002, the Plaintiff made an unscheduled visit to the Clarksburg VAMC for depression, and was evaluated by Richard Jones, a social worker/addiction therapist. (R. at 510-11) Mr. Jones reported that the Plaintiff was not experiencing hallucinations, had no suicidal or homicidal behavior or attempts, and was not using alcohol or drugs. (R. at 510) Mr. Jones noted

---

[2] As noted by the Government, the Plaintiff has only challenged the Commissioner's findings that relate to his mental limitations. Accordingly, this summary will focus only on evidence that is relevant to the Plaintiff's mental impairments.

that the Plaintiff was receiving 50% service-connected disability for PTSD. Id. The Plaintiff visited

the VAMC because he had been taken off the Prozac prescribed to him by the Huntington VAMC

and his depression was getting worse. Id. The Plaintiff reported feeling better after talking about

his problem, and was instructed to call the VAMC if he started feeling worse. Id.

On April 30, 2002, the Plaintiff underwent a psychiatric evaluation performed by Dr.

Surekha Kurapati, MD, a staff psychiatrist at the Clarksburg VAMC. (R. at 825-28) Dr. Kurapati

reported that the Plaintiff had a history of outpatient treatment at the Huntington, West Virginia,

VAMC from 1999-2002 for impulse control problems and PTSD. (See R. at 826) He was being

treated at that time with Paxil 20mg. Id. Dr. Kurapati noted that after returning from Vietnam, the

Plaintiff developed a number of mental problems. Id. He began suffering from sleep disturbances,

with on and off nightmares and flashbacks. Id. He felt uncomfortable in public and was

hypervigilant, always watching his back. Id. He had trouble controlling his temper. Id. He had

been trying to adjust to changes in his personal and home situation as he was recently divorced. Id.

Although he had some control and anger problems, he was able to functional well without getting

into out of control behaviors and he believed his medication was helping. Id. On a scale of 0-10,

with 0 being depressed and 10 feeling good, he placed himself at around a 6. Id. He denied any

suicidal or homicidal ideations, denied any legal problems, and denied any substance abuse other

than nicotine. Id. Dr. Kurapati diagnosed him with chronic PTSD, loneliness and unemployment

secondary to PTSD, and an Axis V global assessment of function ("GAF") score of 55, indicating

moderate difficulty. (R. at 827) Because the Plaintiff felt that the Paxil was helping him. Dr.

Kurapati recommended remaining on that medication and increasing physical activity.  Id.

The Plaintiff visited Dr. Kurapati on July 10, 2002, for sleep disturbances caused by disturbing thoughts.  (R. at 825)  He reported being happy because his service-connected disability was increased from 50% to 100%.  Id.  His mood was euthymic and his affect was mood congruant.  Id.  He denied hallucinations, delusions, and denied suicidal or homicidal ideations.  Id.  Dr. Kurapati diagnosed him with chronic PTSD with insomnia and prescribed Quetiapine 25mg to supplement his Paxil.  Id.

Dr. Kurapati reported on August 1, 2002, that the Plaintiff tolerated the Quetiapine well, was sleeping better, had less road rage, denied any side effects, and quit smoking his tobacco pipe.  (R. at 822)  Dr. Kurapati recommended the Plaintiff continue his same medications.  Id.  Dr. Kurapati also conducted an abnormal involuntary movement scale-plus extrapyramidal side effects (AIMS-plus EPS scale) test on the Defendant, who scored 0 (no abnormal movement) on every scale.  (R. at 501-02)

On August 6, 2002, Richard L. Campbell, a PTSD rehab technician, attempted to contact the Defendant by phone to set up an appointment for a PTSD evaluation.  (R. at 500)  Mr. Campbell left a message on the Defendant's voice mail asking him to return his call.  Id.

The Plaintiff visited Dr. Kurapati on November 1, 2002, for a followup.  (R. at 820-21)  He reported living by himself after his divorce, and was attempting to secure a loan to buy some land to live in a wooded place; however, he was having trouble getting the loan due to a bad credit record, which was stressing and worrying him.  (R. at 820)  He reported being able to sleep 5-6 hours a day, which has improved his mood.  (R. at 821)  Dr. Kurapati noted that he presented well,

with a relaxed, euthymic mood and congruent affect.  Id.  He denied hallucinations or suicidal/homicidal ideation, and presented no delusional thinking.  Id.  Dr. Kurapati diagnosed him as PTSD with insomnia and impulse control, stable, and advised him to continue his medications and increase exercise.  Id.

The Plaintiff visited Dr. Kurapati on February 7, 2003, for a followup.  (R. at 816-17)  He reported that his attempt to purchase some land to live on fell through due to his bad credit, which caused him some frustrations; he talked about other frustrations, such as the government not caring about soldiers, but overall reported doing reasonably well on his medications.  (R. at 816-17)  He reported on and off intrusive thoughts about his combat experiences, which he handled reasonably well.  (R. at 817)  He denied any side effects to his medication.  Id.  Despite his frustrations, Dr. Kurapati reported that he presented well, with a good range of affect, no hallucinations, no suicidal or homicidal ideations, an no delusional thinking except for on and off intrusive thoughts and nightmares.  Id.  Dr. Kurapati maintained a stable diagnosis, reported a GAF score of 55, and recommended the Plaintiff remain on his current medications, watch less television, and try to keep busy and do regular exercise.  Id.

The Plaintiff visited Dr. Kurapati on May 15, 2003, for a followup.  (R. at 811-812)  He reported moving in with his niece and her family; he was lonely, and so they both decided to move in together and share the expenses.  (R. at 811)  He reported that he still gets irritated on occasion, and has some jerky movements in the nighttime.  (R. at 811)  He further reported that both of his ex-wives complained that he tried to be aggressive during his sleep.  (R. at 811-12)  He denied any side effects to his medication, and felt that his Paxil was helping him.  (R. at 812)  Dr. Kurapati

maintained the Plaintiff's previous diagnosis, advised him to avoid watching war news on television, use relaxation and behavior modification, and have his niece monitor him to determine if his nighttime movements are mild muscle jerks or thrashing/aggressive behavior.  Id.

Dr. Kurapati evaluated the Plaintiff for a followup on August 29, 2003.  (R. at 809-10)  The Plaintiff reported having disrupted sleep; he did not remember his dreams, but was waking up at 3 in the morning and struggling to get back to sleep.  (R. at 809)  Although he continues to struggle with intrusive thoughts of war memories, Dr. Karupati maintained the same diagnosis.  (R. at 810)  Dr. Karupati prescribed an increased dose of Paxil and Quetiapine.  Id.  If the Plaintiff's sleep problems continue, Dr. Karupati would order a sleep study.  Id.

On January 13, 2004, the Plaintiff visited Dr. Kurapati for a followup.  (R. at 808-09)  He reported not tolerating the increased dose of Paxil, as it was too sedating.  (R. at 808)  He moved out of the trailer he shared with his niece, and now lives by himself with his cat.  Id.  He reported being happy living by himself, and was keeping busy by working on a family tree.  Id.  He was also trying to help other veterans with their disability and retirement claims.  Id.  Overall, Dr. Kurapati noted that the Plaintiff's diagnosis had not changed, but noted improvement with medications.  (R. at 809)

The Plaintiff visited Dr. Kurapati on April 13, 2004, for a followup.  (R. at 805)  He reported that he was doing well on his current medication dosages, but had stopped taking the morning dose of Quetiapine because it made him lethargic.  Id.  He kept busy working on genealogy, working on the computer, and taking care of his cats.  Id.  The war news continued to bother him but he was managing well overall.  Id.  Dr. Kurapati recommended no change in treatment, and upgraded his GAF score to 55-60.  Id.

The Plaintiff visited Dr. Kurapati on July 13, 2004, for a followup. (R. at 801) He reported doing reasonably well on his current medications. Id. He was staying busy by working on his land and helping other Vietnam war veterans with trying to obtain benefits, which appeared to be building his self esteem. Id. Dr. Kurapati noted good improvement with his medication, and recommended no change in treatment. Id.

The Plaintiff visited Dr. Kurapati on October 13, 2004. (R. at 799) He reported that he was recently diagnosed with diabetes mellitus, and was slowly getting adjusted to changes in his diet. Id. He continued to work with other veterans and work on his genealogy, helping his mood and self esteem. Id. Dr. Kurapati upgraded the Plaintiff's GAF score to 60 and recommended the same course of treatment, with additional emphasis on watching his diet and regular exercise. Id.

A nursing triage note written by Constance R. Caroli, RN, dated January 10, 2005, states that the Defendant was given a V-4 Depression screen. (R. at 425) The Defendant reported that he was being seen in the mental health clinic, and that over the past month he denied feeling down, depressed, or hopeless. Id. He also denied having little interest or pleasure in doing things. Id. Nurse Caroli's report states that the depression screen was negative. Id.

The Plaintiff visited Dr. Kurapati on January 10, 2005. (R. at 796) He reported that, other than making continued attempts to adjust his diabetic medication and maintain proper blood sugar levels, he was functioning reasonably well. Id. He continued to work on his genealogy and work with other veterans, and was baby-sitting his great niece. Id. The babysitting appeared to have calmed him down. Id. Dr. Kurapati recommended no change in treatment and found that the Plaintiff's impulse control problems were improving. Id.

The Plaintiff visited Dr. Kurapati on March 9, 2005. (R. at 795) He reported sleeping better on his current medications, and was keeping himself busy by helping other veterans, working on his genealogy, and occasionally baby-sitting his great niece. Id. Dr. Kurapati made no change in treatment and no change in diagnosis. Id.

The Plaintiff visited Dr. Kurapati on June 10, 2005. (R. at 791-92) He reported that he was doing well on his medications, his sleep had improved, and he was keeping himself busy by adding a storage area to his trailer. (R. at 792) He continued to work on his genealogy, and had planned to take a trip with a friend to Oklahoma. Id. He was, however, worried about some of his physical health problems and an upcoming prostate biopsy procedure. Id. Dr. Kurapati made no changes to his treatment, and upgraded his GAF score to 65-70 (mild impairment). Id.

The Plaintiff visited Dr. Kurapati on September 20, 2005. (R. at 787) The Plaintiff reported that his 32-year-old daughter was coming to live with him and that they were both getting along well. Id. He was also planning to apply for the CRSC benefits for combat related veterans. Id. He continued to help other veterans with their benefits and services applications. Id. Dr. Kurapati made no treatment changes, and upgraded the Plaintiff to a GAF score of 70. Id.

Dr. James K. Egnor, MD, a state agency consultant specializing in internal medicine, submitted a physical RFC evaluation on December 27, 2005, assessing the Plaintiff through September 30, 2005. (R. at 522-32) Dr. Egnor determined the Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push or pull without limitations. (R. at 525) Dr. Egnor found no postural, manipulative, visual, or communicative limitations. (R. at 526-28) Dr. Egnor found

that the Plaintiff should avoid concentrated exposure to extreme cold and vibration, but had no other environmental limitations. (R at 528) Dr. Egnore found noted that the Plaintiff lives with family is independent and cares for himself, cooks, cleans the house, does laundry, mows the lawn, goes outside daily, drives, shops, pays bills and counts change, watches television, and plays computer games most of the day. (R. at 531) The Plaintiff claimed that standing and walking increased his pain, and that can he walk 15 minutes or stand 10 minutes, but Dr. Egnore found his pain complaints to not be fully credible because he did not take pain medication and had not visited the pain clinic. Id. Dr. Egnor also noted that the Plaintiff returned a personal pain questionnaire form without filling it out, indicating no pain. Id. Overall Dr. Egnor found the Plaintiff's complaints to be only partially credible, and reduced his RFC to medium work with some environmental limitations, reflecting the effects of his reported symptoms on his daily living and work activities. Id.

On February 3, 2006, Dr. Karl G. Hursey, Ph.D, a state agency consultant specializing in psychology, completed a psychiatric review technique form for the period from January 12, 2001 through September 30, 2005. (R. at 533-47) Dr. Hursey determined that the Plaintiff suffered from symptoms characteristic of a Listing 12.06 Anxiety-Related Disorder, characterized by the residual symptoms of PTSD. (R. at 533. 538) These symptoms were not considered to be severe and did not satisfy the "B" criteria of Listing 12.06, presenting no restriction of daily living activities; mild difficulty in maintaining social functioning; no difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. at 533, 543) Dr. Hursey also determined that the evidence did not establish the presence of the "C" criterion for Listing 12.06. (R. at 544) Based on the medical records, Dr. Hursey found the claimant's statements to be valid and his residual PTSD

symptoms to be well-controlled by his current treatment.  (R. at 545)

The Plaintiff visited Dr. Kurapati on March 21, 2006.  (R. at 783-84)  The Plaintiff reported that the winter is a bad time for him, but wanted to try and come off the Quentiapine now that the winter was ending.  (R. at 783-84)  The Quetiapine may have been affecting his blood sugar levels and contributing to his diabetes.  (R. at 783)  Dr. Kurapati diagnosed the Plaintiff with chronic PTSD with residual symptoms, an anxiety disorder not otherwise specified, a personality disorder not otherwise specified, and downgraded his GAF score to 60-65.  (R. at 784)  Dr. Kurapati instructed the Plaintiff to taper off and discontinue the Quetiapine and prescribed Mirtazapine 7.5mg at bedtime, taking an additional 7.5mg as needed for insomnia.  Id.

The Plaintiff visited Dr. Kurapati on May 9, 2006.  (R. at 782)  He reported that the switch from Quetiapine to Mirtazapine helped his sleep.  Id.  Dr. Kurapati's diagnosis and treatment plan were unchanged.  Id.

The Plaintiff visited Dr. Kurapati on September 1, 2006.  (R. at 780-81)  He reported doing reasonably well, but having frustrations after winning the Lottery – he was having troubles with the taxes and paperwork.  (R. at 781)  He continued to help his niece and her children.  Id.  Dr. Kurapati upgraded the Plaintiff's GAF score from 60-65 to 65 and upped his Mirtazapine dosage to 50mg but otherwise made no changes to the Plaintiff's diagnosis and treatment.  Id.

The Plaintiff visited Dr. Kurapati on December 6, 2006.  (R. at 776-78)  He reported that the Lottery he had been playing was a hoax, and that he had actually lost money in the scam; he also received notification that his disability benefits were being reduced.  (R. at 776)  The combination of these events caused him more anxiety, worry, and frustration.  Id.  Dr. Kurapati noted that the

Plaintiff's mood was dysthymic and his affect was mood congruent, with more anxiety than before and continued sleep problems.  Id.  His GAF score was downgraded to 55-60, and his Mitrazapine prescription was reduced to 15mg.  (R. at 776-77)  Dr. Kurapati also noted that the Plaintiff would have trouble maintaining employment because of his personality problems and difficulty in interacting with others.  (R. at 776)

The Plaintiff visited Dr. Kurapati on June 19, 2007.  (R. at 769)  He reported moving to Parkersburg, West Virginia, and had begun regular exercise.  Id.  He was in contact with his niece but avoided her partner, and had been seeing his son to resolve some issues between them.  Id.  He admitted that he still had some occasional anger control problems, which became more difficult whenever he stopped taking his Paxil.  Id.  He was sleeping better, and was doing better overall.  Id.  Dr. Kurapati noted that he presented well, interacted well, had a good range of affect, and did not exhibit any suicidal/homicidal ideation.  Id.  His mental status was intact and functioning well except for on and off intrusive thoughts and anger control problems.  Id.  Dr. Kurapati's diagnosis and treatment were unchanged.  Id.

The Plaintiff visited Dr. Kurapati on September 19, 2007.  (R. at 759-60)  He reported that he had some conflict with his niece's husband, but had been able to avoid any confrontations.  (R. at 759)  He was functioning reasonably well and liked his new residence.  Id.  His GAF score was upgraded to 60 and no other changes in diagnosis or treatment were made.  (R. at 760)

The Plaintiff visited Dr. Kurapati on February 5, 2008.  (R. at 751)  Other than some issues with maintaining a diabetic diet, he was functioning reasonably well.  Id.  His diagnosis and treatment plan remained unchanged.  Id.

The Plaintiff visited Dr. Kurapati on April 23, 2009.  (R. at 731)  Since his last appointment, the Plaintiff had been diagnosed with a number of health conditions, including a brain tumor, which necessitated intensive medical treatment.  Id.  Despite these problems, the Plaintiff was very positive and upbeat, without any vegetative symptoms of depression.  Id.  His religious faith had helped him look at life in a positive way, and he denied any problems.  Id.  He was continuing to take his medication, had good range of affect, his mood and affect were euthymic, and his mental status was intact.  Id.  Dr. Kurapati upgraded the Plaintiff's GAF score to 60-65, noting that "I have never seen him this positive before, his illness appears to have given him a different perspective on life."  Id.  No changes were made to his treatment plan.  Id.

Dr. Atiya M. Lateef, MD, a state agency medical consultant, submitted a physical residual RFC assessment on October 15, 2009, finding insufficient evidence prior to September 30, 2005, to set the Plaintiff's physical RFC.  (R. at 661-68)

Dr. Frank Roman, Ed.D., a state agency consultant, completed a psychiatric review technique form on October 15, 2009, assessing the Plaintiff's mental function through September 30, 2005. (R. at 646-60)  Dr. Roman found that the Plaintiff had symptoms of a Listing 12.06 Anxiety-Related Disorder, characterized by recurrent and intrusive recollections of a traumatic experience that are a source of marked distress, but found that this impairment was not severe.  (R. at 646, 651)  Dr. Roman found in regard to the "B" criteria of the listing that the Plaintiff had only mild restriction of activities of daily living; mild difficulty in maintaining social functioning; mild difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration.  (R. at 656)  Dr. Roman also found that the evidence did not establish the presence of the

"C" criterion. (R. at 657) Dr. Roman noted that the Plaintiff was credible and capable, and that a review of his VA medical records revealed that he was functioning well and that his PTSD was at a mild, nonsevere level. (R. at 658)

On December 3, 2009, Dr. Joseph A. Shaver, Ph.D, a state agency consultant that specializes in psychology, completed a case analysis form, concurring with the October 15, 2009, assessments. (R. at 849)

Dr. Fulvio Franyutti, MD, a state agency medical consultant specializing in pathology, completed a case analysis form on December 10, 2009, concurring with the October 15, 2009, assessments. (R. at 851)

E.    Testimonial Evidence

At the ALJ hearing held on February 17, 2010, the Plaintiff was not present due to illness. (See R. at 33) Instead, Jan Dils, the Plaintiff's counsel waived the Plaintiff's appearance and read a brief opening statement into the record in lieu of testimony. (R. at 34) Ms. Dils informed the ALJ that the Plaintiff was being treated at the Clarksburg VA primarily for PTSD, which was diagnosed as chronic with impulse control problems. Id. According to Ms. Dils, the Plaintiff had a very difficult time getting along with people, suffered from insomnia, and had difficulty sustaining employment. (R. at 34-35) Additionally, the Plaintiff was receiving 100% disability from the VA with an unemployability rating going back to 2001. (R. at 34-35)

Following Ms. Dils' opening statement, Cecilia Thomas, a vocational expert, testified as to the Defendant's ability to sustain employment. (R. at 35-45) Ms. Thomas testified that her review of the record showed that the Plaintiff last worked in 1995, when he made $18,000 working for

Sears. (R. at 36) She also identified several other earlier periods during which the Plaintiff was employed, but the Plaintiff did not make much money. Id. He performed some temporary work for Manpower Temporary Service company on two different occasions in 2000, earning about $12,000. Id. These jobs were various types of data entry jobs and computer type activity. Id.

After identifying the Plaintiff's past work experience, the ALJ then posed the following hypothetical to Ms. Thomas:

> ALJ: Assume an individual of the Claimant's age, education and work experience, all right, whose work experience is he has no past relevant work. We have a gentleman who was from closely approaching advanced age to advanced age, GED, no past relevant work. Here is the first hypo. Assume an individual of the Claimant's age, education and work experience who has residual functional capacity for medium work, nonexertionally limited to routine, repetitive tasks, no concentrated exposure to extreme cold or vibration, no loud, noisy work environment. Are there any unskilled jobs this individual could perform?

> VE: Yes, sir. Considering only those factors, we could look at routine type positions, janitorial positions numbering approximately 1,200,000 nationally, approximately 91,000 regionally, representative DOT 389683010. We could look at bagging positions, a retail situation numbering approximately 228,000 nationally, an estimated 20,000 regionally, a representative DOT code 920687014 and these would be representative of entry level, unskilled jobs we could consider with this type of situation.

> ALJ: Okay. Now, the next hypo is light. And let's see, when did he hit 50? He hits 55 July 8 of '03 which is before. Can you give me light jobs with the same nonexertional?

> VE: Yes, sir. We could look at light cashier positions, numbering approximately 1,288,000 nationally, an estimated 100,000 regionally and I don't think I stated the region I'm looking at here. It's West Virginia, Virginia, Ohio and Kentucky. Representative DOT 211462010. We could look at cafeteria attendant positions numbering approximately 108,000 nationally, an estimated 6,000 regionally, the representative DOT 311677010.

> ALJ: Okay. Is your testimony consistent with the Dictionary of Occupational

Titles?

VE:     Yes.

(R. at 40-41)  Ms. Dils, the Plaintiff's attorney, then questioned Ms. Thomas about the effect that

the Plaintiff's social and psychological problems would have on his ability to sustain the occupations

identified in response to the ALJ's hypotheticals:

Q.      If a person, due to the diagnosis of personality disorder and PTSD, would have difficulty dealing with the public, would have marked dealing with the public and a marked difficulty dealing with co-workers, would you still name the jobs that you named?

A.      Well, there may be some difficulty in any of the jobs, you know, the cashier positions, even some of the – even the bagging positions that the person was working in a retail – in a grocery store type setting where the person might be particular with how their groceries would be packed.  So these types of interruptions could, yes, interfere with the jobs, not so much the cleaning, but those – the cashier and the bagging in particular and the cafeterias as well where there are people around.

. . .

Q.      Any close attention to detail on these jobs seeing?

A.      Not – no, not so much.

. . .

Q.      If this – and in the first or second hypothetical, if this person had – did not act appropriately in the workplace – and I was going to say marked, but I'll try to define it – that he would have maybe once or twice a month acting inappropriate in public or in the workplace such as talking inappropriately to a supervisor, reacting inappropriately to a co-worker such as an outburst – we'd – they still have co-worker contact in these jobs you named.  Is that correct?

A.      Yes, some – to some degree.

Q.      Even though the cleaning position you're saying it wouldn't have the public contact, they still have a boss?

A.      Right. There would be someone at some point to answer to. Those are typically more solitary in nature but, you know, at some point there is a person checking in to make sure that the job is done or to give further instruction or move the person to another area, that kind of thing.

(R. at 42-44)

Next, the ALJ questioned Ms. Thomas about a job at Sears that the Plaintiff worked in 1995. (R, at 44-45) Ms. Thomas stated that the record was incomplete as to the exact work role that the Plaintiff performed, but that his job, as described, was a medium job due to the fact that he was lifting 10-50 pounds. (R. at 44) Ms. Dils then informed the ALJ that the Plaintiff was fired from the Sears position because of inappropriate contact with his co-workers. (R. at 45)

Finally, Ms. Dils provided some additional detail for the record about the Plaintiff's psychological and social difficulties. (R. at 45-46) Due to his PTSD, the Plaintiff did not maintain a consistent job, which was consistent with his unemployability rating from the VA. (R. at 45) His PTSD also affected his ability to interact with his family. Id. His sister finally took him in to her home, and he has at times been homeless due to his outbursts and anger issues. (R. at 45-46) He has also been nearly placed in a nursing home because of his behavior. (R. at 46)

F.      Lifestyle Evidence

On an Adult Function Report form completed on November 8, 2005, the Plaintiff reported that he lived in a mobile home with his family. (R. at 167) On a normal day he would wake up around 9:00 AM, play computer games until about 1:00 PM, take a break to check the mail or eat lunch, and then play computer games until about 6:00 PM. Id. He would then make supper, watch

television, play computer games, and go to bed around 11:00 PM.  Id.

Occasionally, the Plaintiff would babysit his niece.  (R. at 167)  He would mow the lawn once a week and do laundry once a month.  (R. at 169)  He would cook his own meals each day, but needed to be reminded to take his medication, bathe, clean his hair, shave, do dishes, or clean the house.  (R. at 168-69)  Once a month, he would shop, both in stores and over the internet by computer, for food or computer items.  (R. at 170)  The Plaintiff would go outside daily, could do so alone, and could get around by either walking or driving a car.  Id.

G.    Other Evidence

The Plaintiff submitted a letter to the Court, dated February 17, 2010, stating that he was employed at Sears as a computer salesperson but was fired due to alleged sexual harassment.  (R. at 227)  He stated that it was very difficult for him to try and maintain employment because he has anger outbursts.  Id.

The Plaintiff's sister, Christine Webb, submitted a letter to the Court dated March 3, 2010. (R. at 228-29)  Ms. Webb stated that the Plaintiff, prior to moving in with her and her family, did not bathe himself or take his medication.  (R. at 228)  After moving in with Ms. Webb, the Plaintiff acted out towards her or her family members on several occasions.  He cussed at her in a restaurant and yelled at her when she attempted to help him take off his coat.  (R. at 228)  He often yelled and cursed at the television and computer, occasionally yelled at Ms. Webb's grandchildren, and once got into a fist fight with her son-in-law.  (R. at 229)  There were times where he would refuse to take a shower, insisting that he wait for his caregiver to come shower and shave him.  (R. at 228-29) Despite these problems, Ms. Webb acknowledged that the Plaintiff would always apologize when

he got out of line and that after he began taking his medication regularly he was doing better. (R. at 229)

### III. CONTENTIONS OF THE PARTIES

The Plaintiff, in his motion for summary judgment, alleges that the ALJ's RFC determination failed to take into account a number of his mental limitations. (Pl.'s Mot. for J. on the Pleadings 4-5, ECF No. 8) The Plaintiff requests that the Court reverse the decision of the Commissioner and award benefits or, alternatively, remand the case for a new hearing. Id. In contrast, the Defendant alleges in his motion for summary judgment that the decision denying the Plaintiff's claim for DIB benefits is supported by substantial evidence and should be affirmed as a matter of law. (Def.'s Mot for Summ J.1, ECF No. 11) The Defendant argues that the ALJ performed a comprehensive review of the medical records and gave significant weight to the treatment reports of the Plaintiff's treating psychiatrist, which demonstrated that the Plaintiff's posttraumatic stress disorder ("PTSD") was under control and stable with medications. (Def.'s Mem. in Supp. of Mot. for Summ. J. 10-14, ECF No. 12)

### IV. STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. See 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as

adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. See Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case de novo when reviewing disability determinations." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

A.    Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."  20 C.F.R. § 404.1520.]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520.  If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step.  Id.

B.    The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

> **1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2005.**  (R. at 16)

2.	The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 12, 2001 through his date last insured of September 30, 2005 (20 CFR 404.1520(b) and 404.1571 *eq seq.*). (R. at 16)

3.	Through the date last insured, the claimant had the following severe impairments: posttraumatic stress disorder, thoracic spine impairment, and hearing impairment (20 CFR 404.1520(c)). (R. at 16)

4.	Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (R. at 18)

5.	After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he was limited to routine repetitive tasks. The claimant had to avoid concentrated exposure to extreme cold and vibration. He could not have a loud or noisy work environment. (R. at 19)

6.	The claimant has no past relevant work (20 CFR 404.1565). (R. at 24)

7.	The claimant was born on July 8, 1948, and was 52 years old on his alleged onset date, which is considered to be an individual closely approaching advanced age. The claimant was 57 years old, which is defined as advanced age, on the date last insured (20 CFR 404.1563). (R. at 24)

8.	The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564). (R. at 24)

9.	Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568). (R. at 24)

10.	Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)) (R. at 24)

**11.** **The claimant was not under a disability, as defined in the Social Security Act, at any time from January 12, 2001, the alleged onset date, through September 30, 2005, the date last insured (20 CFR 404.1520(g)).** (R. at 26)

## C. The ALJ's RFC Is Supported By Substantial Evidence

The Plaintiff's only assignment of error is that the ALJ's RFC assessment is not supported by substantial evidence because it failed to include all of his mental limitations. (Pl.'s Mot. for J. on the Pleadings 4-5, ECF No. 8) Upon review of the motions and the record, the undersigned agrees with the Commissioner that the ALJ supported his RFC determination with substantial evidence because the Plaintiff's psychological problems were reasonably controlled by medication and his condition improved over the course of his treatment.

A claimant's Residual Functional Capacity ("RFC") is the most that a claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). A claimant's RFC evaluates his ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(4). The evaluation of a claimant's mental RFC is an assessment of his ability to perform certain mental activities, such as limitations in understanding, remembering, or carrying out instructions; or responding appropriately to supervision, co-workers, and work pressures in a work setting. 20 C.F.R. § 404.1545(c). The claimant's mental RFC is determined by evaluating evidence such as:

- History, findings, and observations from medical sources (including psychological test results), regarding the presence, frequency, and intensity of hallucinations, delusions or paranoid tendencies; depression or elation; confusion or disorientation; conversion symptoms or phobias; psychophysiological symptoms; withdrawn or bizarre behavior; anxiety or tension.

- Reports of the individual's activities of daily living and work activity, as well as testimony of third parties about the individual's performance and behavior.

•       Reports from workshops, group homes, or similar assistive entities.

SSR 85-16, 1985 WL 56855, at *2 (1985).

After reviewing the record and the ALJ's decision, the undersigned agrees with the Commissioner that the ALJ thoroughly evaluated the evidence and made a proper assessment of the Plaintiff's mental impairments. First, Dr. Kurapati's extensive treatment records from April 2002 to April 2009 show that the Plaintiff's mental state was not only stable with medication, but actually improving over time. By the date last insured, Dr. Kurapati reported that the Plaintiff's PTSD was stable on medication and that the Plaintiff presented and interacted well, did not exhibit any suicidal or homicidal ideation or delusional thinking, was keeping himself busy by helping other veterans, was getting along well with his 32-year-old daughter; and that the his GAF score had improved to 70, indicating only mild impairment. (R. at 787) By the time of his last appointment in 2009, the Plaintiff, despite being diagnosed with brain cancer, was extremely positive, stable on his medication, and was doing so well that Dr. Kurapati noted that "I have never seen him this positive before, his illness appears to have given him a different perspective on life." (R. at 731) Dr. Kurapati's records consistently demonstrate that the Plaintiff's mental disorders were controlled and stable with medication, his mental status was intact, he enjoyed working on his genealogy and helping other veterans, he did not suffer from hallucinations or delusions, and he got along well with friends and family. (See R. at 731, 751, 769, 780-81, 782, 783-84, 787, 792, 795, 796, 799, 801, 805, 808-09, 809-10, 811-12, 816-17, 820-21, 822, 825-28)

Second, the Plaintiff's own reported daily activities indicate that he was able to function in

society and interact with others.  Although the Plaintiff reported being fired from Sears because he did not get along with some of the female employees, he also stated that he had no problems getting along with family, friends, neighbors, or others, and even reported that he got along "very well" with authority figures.  (R. at 172-73)  Despite needing reminders for some things, such as taking medication or cleaning the house, he was able to go outside every day, drive a car, shop in stores, pay bills and use a checkbook, cook for himself, do laundry, and mow the lawn.  (R. at 167-70)  He got along well with his daughter (R. at 787), his niece and her family (R. at 811-12), and a friend from Oklahoma (R. at 792), and had been working on resolving some issues he had with his son. (R. at 769, 787, 792, 811-12)  He also interacted regularly with other veterans while helping them obtain benefits and occasionally babysat his niece. (R. at 167, 781, 787, 795, 796, 799, 801, 808)

Third, all three of the psychological consultants that evaluated the Plaintiff's claim concluded that his mental impairments were mild and nonsevere.  (R. at 533-47, 646-60, 849) However, the ALJ rejected those three opinions in favor of the Plaintiff, finding that he suffered from PTSD through the date last insured.  (R. at 24)  Despite giving the Plaintiff the benefit of doubt on these evaluations, the positive treatment record and GAF scores documented by the Plaintiff's treating psychiatrist all showed that his PTSD was controlled.  (R. at 24)

In summary, the above evidence – all of which was analyzed in great detail by the ALJ– confirms that the Plaintiff's mental limitations were adequately addressed in his RFC determination because his PTSD and social deficiencies were well-controlled and improving through therapy and medication.  The Plaintiff believes that a 100% disability finding from the Veterans Affairs

Administration,[3] coupled with evidence that the Plaintiff lived alone and primarily engaged in solitary activities such as playing on his computer, demonstrate that he could not function properly around other people. However, it is the duty of the Commissioner, not the court, to resolve conflicts in the evidence and this Court will not substitute its judgment in place of a well-reasoned and thoroughly documented decision. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Accordingly, the undersigned Magistrate Judge finds that the ALJ's RFC determination is supported by substantial evidence.

## VI.  RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits.  Accordingly, I recommend that the Plaintiff's Motion for Summary Judgment (ECF No. 8) be **DENIED**, the Defendant's Motion for Summary Judgment (ECF No. 11) be **GRANTED**, and the Decision of the Administrative Law Judge be affirmed and this case **DISMISSED WITH PREJUDICE**..

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above

---

[3] The Court notes that the disability findings of other agencies are not binding on the Social Security Administration, which must make a disability determination based on social security law.  20 C.F.R. § 404.1504.

will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this **16th** day of **May**, **2011**.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE